UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-160(3) (NEB)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

GREGORY HAMILTON
a/k/a "Lil Lord,"

        Defendant.

**GOVERNMENT'S SENTENCING POSITION**

*"Whether it be from violence with guns, drug sales, a combination of both, we have been preyed upon enough as a community."*

- Concerned Community Member Who Fears Retaliation.

    For over 20 years, the Highs street gang attempted to hijack much of north Minneapolis. It converted public spaces into open-air drug markets, preyed on vulnerable youths, and normalized the regular sound of machinegun fire. Highs members glorified the gang at the expense of any other consideration. It was more important to shoot a rival gang member on sight—be it a public place, a drive-by shooting, or at a well-attended party—than to worry about killing innocent bystanders. The Highs criminal enterprise is a scourge on public safety.

    The Highs and Lows were engaged in a vicious war that resulted in death and destruction not only to perceived rivals, but to innocent bystanders caught in the crossfire. Defendant Gregory Hamilton must account for the work he "put in" to benefit the Highs enterprise by carrying out multiple shootings on behalf of the gang. The government respectfully submits that a life sentence is appropriate in this case.

## The Highs Criminal Enterprise

The Highs began laying claim to areas of north Minneapolis in 2004. Since that time, the Highs have dominated a large swath of north Minneapolis and its members have ruthlessly protected its turf. The Highs are engaged in a violent rivalry with the Lows. Each gang's moniker stems from its location—north or south—of West Broadway Avenue in Minneapolis:



*Figure 1: Overview of Highs and Lows Territories*

The May 2004 murder of Christopher Little, a known Lows member, proved to be a cataclysmic event in the history of the enterprise. Members of the Highs and Lows have engaged in hundreds of shootings and murders in their territories since Little's murder, which only serves to restart the circles of violence and revenge. The victims of the violence were not only members or associates of the gangs, but also innocent adults and children who simply live within the gangs' territories.

Although the Highs enterprise consists of several "cliques," the gang's singular objective has remained the same: its members must "put in work" to promote, benefit, and enrich the gang. Highs members must commit acts of violence, procure firearms to facilitate the gang's activities, or engage in criminal activity such as fraud, robbery, or drug trafficking. The only other requirement is that members instill fear in rival gang members. Members of the Highs are expected to "hunt" rival gang members: an express directive to locate and kill rivals. Highs members also are expected to defend each other and to respond to any perceived disrespect from rival gangs. Highs and Lows gang members frequently take to social media to heighten their rivalry. Members of each gang post photographs trespassing in the other gang's territory or defacing the graves of murdered rivals. Highs members also frequently post images of themselves with money, drugs, and expensive items to gain respect. This glorification of gang life also serves to lure others into the lifestyle.

The Highs' existence depends on the success of the criminality of its members, which is comprised of a loosely defined and fluid hierarchy of (1) members who earned substantial respect from past criminality and receive a higher amount of the profits, host gatherings, and cover funeral expenses; (2) members focused on engaging in armed violent activity to protect Highs activities and target rival members; and (3) members focused on drug or weapons trafficking to further the ends of the criminal enterprise. Its members resort to any crime—murder, kidnapping, arson, robbery, bribery, extortion, gambling, fraud, drug trafficking, arms dealing—so long as it glorifies the Highs enterprise or denigrates a rival gang.

Although its general credo has created violence in many parts of Minneapolis, a particular area within Highs territory acts as a representative microcosm of its activities. The Highs criminal enterprise runs rampant in the area of West Broadway and North Lyndale Avenue, including numerous businesses, and turned it into a de facto Highs headquarters:



*Figure 2: Intersection of West Broadway and North Lyndale Avenue in Minneapolis*

In fact, the Winner Gas Station has been openly referred to as "The Murder Station," "Murder Shop," or simply the "Murder," while the nearby Merwin Liquors and Walgreens have been essentially open-air drug markets.[1] The Highs stranglehold on

---

[1] This Walgreens location has since closed, in part due to the Highs activities in and around its location. This is a representative example of how the enterprise can affect the economic health of communities.

4

this area has been so tight that its members do not hesitate to flaunt their illegal activities openly:



*Figure 3: Highs Member Flaunting Currency Outside Winner Gas in Highs Territory*

The sheer amount of gun violence, drug trafficking, and other illicit activity demonstrate the extent to which the Highs have damaged the community. Between 2018 and 2023, in north Minneapolis alone—comprising both Highs and Lows territory—the statistics are staggering:

- 2,043 recovered firearms;
- 105 recovered switches;
- 7,997 "shots fired" calls;
- 20,265 ShotSpotter activations;
- 1,151 gunshot victims; and
- 155 homicides

The plague of opioids—and particularly fentanyl, a prime Highs product— requires no introduction. According to the Minnesota Department of Health, in 2022,

5

Minnesota reported 4,228 non-fatal opioid-involved overdoses.[2]  Unfortunately, overdose deaths in Minnesota due to opioid misuse has skyrocketed from 342 in 2018 to 1,002 in 2022.[3]  Hennepin County alone experienced 378 opioid-related deaths in 2022, 94.7% of which were directly linked to fentanyl.[4]  Beginning in approximately 2020, the Highs began actively contributing to this epidemic when it transitioned from marijuana sales as its primary moneymaker to instead peddling synthetic opioids.

Put simply, instead of getting gas at the local station or picking up prescriptions at the neighborhood Walgreens, residents near Highs territory live with the fear of being robbed, shot with a machinegun during a gang-related shooting, or losing a loved one to a fentanyl-related incident.  The Highs criminal enterprise, fueled by the greed of its members and their thirst for power and respect, is a public health crisis.

### Gregory Hamilton's Offense Conduct

Violence was not incidental to the Highs.  It was the foundation of their identity and their method of enforcing dominance.  Within this structure, Gregory Hamilton aligned himself with and embraced that culture fully.  On August 8, 2021, he participated in two armed attacks that included the execution-style killing of an innocent man.

---

[2]  Minnesota Department of Health, *Drug Overdose Dashboard,* last accessed 2/6/2024 at https://www.health.state.mn.us/opioiddashboard.

[3]  *Id.*

[4]  Hennepin County, *Overdose Epidemic*, last accessed 2/6/2024 at https://www.hennepin.us/opioid.

*Attempted Murder of Arequise Morgan*

On August 7, 2021, prominent Highs member Prince Martin was shot and killed at Winner Gas Station. PSR at ¶18. As Jovan Knight testified at trial, Martin's killing immediately triggered expectations among Highs members to retaliate. ECF No. 1947 (Transcript of Jovan Knight Testimony). The following day, Highs members gathered at the gas station for a memorial. PSR at ¶18. Among them were Dantrell Johnson, Keon Pruitt, and Gregory Hamilton who were all armed, committed participants in the gang's violent culture. *See id.* Hamilton wore a teal hooded sweatshirt with an orange inner lining and a black facemask to the memorial. Trial Exhibit C-12.



*Figure 4: Hamilton wearing teal hooded sweatshirt with orange lining and black facemask.*

Later that day, Hamilton and Johnson left the memorial in a Volkswagen van and drove directly to Wally's Foods, a known Lows hangout. Trial Exhibits D-2A, D-3A; PSR at ¶19. Surveillance video shows them driving past rival gang member Arequise Morgan. Trial Exhibit D-4, D-4A. As they passed, Hamilton aimed a firearm out the passenger window and fired, striking Morgan in the back. *Id.*



*Figure 5: Hamilton fires at Lows member Arequise Morgan outside Wally's Foods.*

*Murder of Darryl Wells*

Approximately two hours after Hamilton shot Morgan, he joined a second coordinated operation, this time killing of Darryl Wells, an innocent man with no gang affiliation. PSR at ¶¶20, 25. At approximately 7:48 p.m., Darryl Wells arrived at the Skyline Market in Lows territory. *Id.* at ¶¶20, 21. Within one minute, Hamilton, Johnson, and William Johnson arrived in a Dodge Charger and parked directly behind Well's car. *Id.* Hamilton was the first to exit the Charger, now wearing a black hooded sweatshirt and facemask. Trial Exhibit E-2, E-2A. Just before entering the store, Hamilton pulled the sleeve of his right arm down, covering his hand as he reached for

8

and opened the door. *Id*. Hamilton and Johnson both entered the store together, then split up down different aisles positioning themselves to block escape routes and isolate their target.



*Figure 6: Hamilton covers his right hand with his sweatshirt before opening the Skyline Market entrance.*

Inside the market, Johnson confronted Wells in an aisle and drew two firearms. PSR at ¶ 22. When Wells ran, Johnson immediately opened fire with both firearms, which caused Wells to fall. *Id*.; Trial Exhibit E-5, E-5A. As Wells tried to stand and run out the door, Hamilton positioned himself near the front counter and fired at him. *Id*.



*Figure 7: Hamilton shoots at Wells, who is on the ground after being shot by Johnson.*

9

Wells managed to escape onto Glenwood Avenue, running toward a Porsche driven by Pruitt. PSR at ¶ 23. Seconds later, both Hamilton and Johnson ran from the store, aimed their firearms at a still fleeing Wells, and opened fire again. *Id*. Hamilton and Johnson then returned to the Charger and fled the scene with William Johnson once the shooting outside ended. *Id*.



Figure 8: Hamilton shoots at a still fleeing Wells.

As this occurred, the Porsche continued pursuing the Wells. PSR at ¶ 23. Two juvenile Highs members armed with firearms exited the vehicle, ran into an alley where Wells had collapsed, and fired multiple rounds at close range, killing him. *Id*. Forensic evidence connected the earlier Morgan shooting with the Skyline Market murder. PSR at ¶ 26. Shell casings from the Morgan scene matched those recovered from the alley where Wells was killed. *Id*.

10

## The Presentence Investigation Report

The Presentence Investigation Report calculated an advisory range of life imprisonment, and the facts fully justify such a sentence. PSR at ¶ 95. Hamilton raised several factual objections, objected to the calculated criminal history points, and requested a reduction for acceptance of responsibility. ECF No. 2307. As noted in his filing, Hamilton's factual objections do not require a ruling as they will not affect sentencing. *Id.*; *see also* Fed. R. Crim. P. 32(i)(3)(B). A possible departure for "over-represented" criminal history was identified under U.S.S.G. §4A1.3(b), comment (n.3(A)(ii)) in response to Hamilton's criminal history points objection. *Id.* at ¶ 114. The government did not object to the PSR's Guidelines calculations. ECF No. 147.

### A. Acceptance of Responsibility

The government does object to Hamilton's request for a Guideline sentence reduction for acceptance of responsibility based on his State court plea. Hamilton "has not clearly demonstrated acceptance of responsibility for the offense," and is not entitled to a reduction. U.S.S.G. § 3E1.1(a).

As the Guidelines aptly note, "[the] adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." *See* U.S.S.G. § 3E1.1, comment (n.2). Rather, only in "rare situations" can a defendant "clearly demonstrate" acceptance of responsibility after going to trial. *Id.* And in those rare situations, whether a defendant has accepted responsibility "will be based primarily upon pre-trial statements and conduct." *Id.*; *cf. United States v. Bell*, 411 F.3d 960, 964 (8th Cir. 2005) (finding defendant not entitled to adjustment where

he lied to police before trial and only showed remorse after his conviction). Put simply, "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." U.S.S.G. § 3E1.1, comment (n.1(A)).

Hamilton has not admitted guilt or accepted responsibility for his conduct merely because he pled guilty to the murder of Darryl Wells and negotiated a dismissal for his attempted murder of Arequise Morgan. Here, Hamilton was charged with RICO Conspiracy (Count One) and Using a Firearm During and in Relation to a Crime of Violence Resulting in Death (Count Two). As to Count One, Hamilton rejected the overwhelming evidence supporting the existence of a criminal enterprise that involved significantly more than the murder of Darryl Wells. He also denied that any of his actions, including the attempted murder of Arequise Morgan, were committed on behalf of a criminal enterprise. Instead, Hamilton argued that an enterprise did not exist simply because he did not recognize the existence of a group that he personally called "the Highs." His lack of acceptance of responsibility is compounded by the fact that he also denied association with the enterprise and claimed that his participation in the murder of Darryl Wells was motivated by sadness over the death of Prince Martin and not, as proven at trial, by the Highs' expectation that members attack and retaliate against its rival gang. And as to Count Two, suffice it to say that Hamilton pled not guilty to this offense, despite his state plea. Hamilton's denial of the core elements of this case is inconsistent with any reasonable showing of acceptance of responsibility.

Indeed, Hamilton's pre-trial statements and conduct showed rejection of responsibility. Hamilton filed several pretrial motions to sever, strike, and suppress

and objected to the Magistrate Judge's report and recommendation. ECF Nos. 955, 956, 974, 1069, 1071, 1073. He also argued that both legal and factual issues were in dispute warranting dismissal. ECF No. 1070. Putting the government to its burden of proof, Hamilton required the government to show at trial that a criminal enterprise existed, that he associated with that enterprise, and that he directly participated in the affairs of that enterprise. This sharply contrasts those "rare situations" where "a defendant goes to trial to assert and preserve issues that do not relate to *factual guilt*." U.S.S.G. § 3E1.1, comment. (n.2). Hamilton has not demonstrated acceptance of responsibility and his request for a reduction should be summarily denied.

## The Appropriate Sentence

Hamilton was not a peripheral associate of this enterprise. He participated in armed retaliatory operations, moved in the company of the gang's most violent members, and used firearms in public areas without hesitation. The government submits that a life sentence is not only warranted but necessary under 18 U.S.C. § 3553(a). No lesser sentence can capture the gravity of Hamilton's conduct, the threat he poses to the public, or the need to deter the devastating gang violence that continues to plague North Minneapolis.

### A. The Applicable Law

In following the sentencing methodology laid out by the Supreme Court, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to

13

determine whether they support the sentence requested by a party." *Id.* at 49-50. Section 3553(a) requires the Court to consider a number of factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a). But a district court is not required to provide a mechanical recitation of the Section 3553(a) factors and "has wide latitude to weigh the § 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence." *United States v. San-Miguel*, 634 F.3d 471, 475-76 (8th Cir. 2011).

### B. The 3553(a) Factors

#### 1. Nature and Circumstances of the Offense

The nature and circumstances of the offense warrant a life sentence. On August 8, 2021, Hamilton prepared for violence. He changed clothing between shootings, masked his face, and covered his hand with his sleeve to avoid leaving fingerprints before entering the Skyline Market. He moved tactically inside the store, positioning himself to trap Wells and firing on him when he tried to flee. He then chased Wells outside and fired again. These are not the actions of someone caught up in a moment. They are the actions of someone who had already decided that another human being would die that night. Most aggravating is the retaliatory motive behind the violence, intended to elevate gang status. Hamilton was not defending himself or responding to any threat. He was fulfilling a gang expectation of revenge against an innocent man unaffiliated with any gang. Under these circumstances, § 3553(a)(1) weighs

14

overwhelmingly in favor of the maximum penalty. A life sentence is the only punishment proportionate to the brutality, deliberation, and moral depravity of the Hamilton's conduct.

Hamilton's personal history does not mitigate the offense. If anything, it exacerbates the need for a life sentence. By the time of these offenses, Hamilton was already a committed, knowing, fully-participating member of an extremely violent criminal enterprise. He was not a misguided juvenile, not someone newly exposed to gang influence, and not someone acting under coercion. He was an armed, active participant who aligned himself with the most violent members of the Highs and repeatedly demonstrated his willingness to use lethal force. Nothing in Hamilton's history suggests he will ever abandon gang-based violence. The § 3553(a)(1) inquiry therefore supports a life sentence.

### 2. The Need for the Sentence to Reflect Seriousness, Promote Respect for the Law, and Provide Just Punishment

The murder of an innocent man under these circumstances calls for the most severe punishment. Hamilton helped carry out a coordinated gang killing intended to restore the Highs' reputation after "King Boo" was murdered. He did so after already attempting to murder another rival gang member earlier the same day. A sentence less than life would fail to reflect the extraordinary gravity of this offense. It would minimize the intentional taking of an innocent life, the terror inflicted on the community, and the deliberate nature of this premeditated execution. A lesser sentence would not promote respect for the law and would inadequately reflect the seriousness of the offense and the value of the life that was taken.

15

### 3. Deterrence—Specific and General

The Highs thrived on spectacle and fear. Posting, boasting, and retaliating to project dominance. They glorified violence and measured loyalty in blood. A life sentence communicates clearly to Hamilton, his peers, and his successors that brazen, open-air, disrespect for the law that takes human life and leaves entire communities shattered will be met with commiserate consequences. That message is essential to interrupt the calculus that glorifies violence as a path to status.

Moreover, Hamilton has unambiguously demonstrated that he is not deterred by the law. Even after Hamilton was incarcerated for the murder of Darryl Wells, he continued to glorify gang-life and justify his actions that day. *See* Trial Exhibits A-65, A-66. There is no realistic prospect that Hamilton would cease violent behavior if released with enough time to inflict more damage. Only a life sentence will ensure that he can never again inflict lethal harm.



*Figure 9: Excerpt from Trial Exhibit A-65: Hand-Written Notes Seized from Gregory Hamilton Prison Cell – 2.21.2023*

*Figure 10: Excerpt from Trial Exhibit A-66: Hand-Written Notes Seized from Gregory Hamilton Prison Cell – 5.1.2023*

### 4. Protection of the Public

Hamilton presents an extraordinary danger to the public. His conduct demonstrates not just a willingness to use lethal violence, but a capacity to do so with planning, strategy, coordination, and composure. Hamilton is exactly the type of offender who warrants a life sentence for racketeering murder: an individual for whom violence is purposeful, escalating, and driven by loyalty to a criminal enterprise. His role in two shootings within a single afternoon shows he is capable of extreme violence without hesitation. The public cannot be protected by supervision. It can only be protected by incapacitating Hamilton for the rest of his life.

### 5. Avoiding Unwarranted Disparities

A life sentence aligns with the culpability of the highest-impact Highs offenders who coordinate and shoot, and differentiates them from lesser participants. Anything

17

less would invert proportionality by treating a hands-on enterprise shooter/driver more favorably than those with narrower roles.

## Conclusion

The Court must impose a sentence sufficient, but not greater than necessary to serve the purposes of sentencing. In a case defined by planned retaliation, public terror, and the murder of an uninvolved citizen, only life imprisonment satisfies the factors outlined in 18 U.S.C. § 3553(a). Such a sentence reflects the seriousness of the offense, promotes respect for the law, provides just punishment, powerfully deters, and most critically protects the public from a proven, unrepentant enterprise shooter.

For all these reasons, the government respectfully submits that a Guidelines sentence of life imprisonment fully comports with the United States Sentencing Guidelines and the factors of 18 U.S.C. § 3553(a).

Dated: December 2, 2025                    Respectfully Submitted,

                                                      DANIEL N. ROSEN
                                                    United States Attorney

                                                    */s/ Albania Concepcion*
                                                    Albania Concepcion (ID: 0401536)
                                                    Assistant United States Attorney